UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| JOHN C. MONTGOMERY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:05-0463 |
| | ) | Judge Echols |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is Defendant CSX Transportation Inc.'s ("CSX") "Motion for Summary Judgment" (Docket Entry No. 23), to which Plaintiff John C. Montgomery ("Montgomery") has responded in opposition (Docket Entry No. 27) and Defendant has replied (Docket Entry No. 29). For the following reasons, the Motion for Summary Judgment will be granted.

This is the second dispositive motion in this employment discrimination action which arose after Plaintiff was terminated from his probationary employment as a conductor trainee with CSX. The Court has previously denied Defendant's Motion to Dismiss Plaintiff's claims that his termination violated the Tennessee Public Protection Act ("TPPA"), Tenn. Code Ann. § 50-1-304, and breached his probationary contract with the Defendant railroad. (Docket Entry 1 ¶ 16).

### I. FACTUAL BACKGROUND

By letter dated March 9, 2004, CSX offered Plaintiff employment as a conductor contingent upon several things, including Plaintiff's successful completion of CSX's conductor training

1

program. (Def. SOF ¶¶ 1-2). CSX's conductor training program is governed by the Memorandum of Agreement ("Agreement") between CSX and the United Transportation Union. (Id. ¶ 3).

Under the Agreement, trainees are required to take and pass an Operating Rules Test. (Id. ¶ 5). Plaintiff passed that test. (Id. ¶ 6).

In addition to the Operating Rules Test, trainees are required to take and pass a General Information Test (GIT), which is also known as the ACE Test. (Id. ¶ 7). The GIT is an open book test comprised of 100 questions that encompasses everything related to railroad operations, and a score of 85% or better is required to pass the test. (Id. ¶¶ 8-9).

If a trainee fails the GIT, he or she is given another opportunity, after at least 10 days have passed, to retake the exam. Pursuant to the Agreement, trainees who do not pass the test on the second chance are supposed to be removed from service. (Id. ¶¶ 10-11 and Pf. Resp.).

Plaintiff took the GIT for the first time on May 24, 2004, and scored a 77. (Def. SOF ¶ 12). Eleven days later, on June 4, 2004, Plaintiff took the GIT for the second time and scored 83. However, the score was adjusted to an 84 because the computer program used to score the test was not updated to take into account a recent change in the federal regulations regarding power brakes. (Id. ¶¶ 13-14 and Pf. Resp.).[1]

---

[1] The new power brake law went into effect on April 1, 2004, but the scoring program had not been adjusted for the updated law.

2

Plaintiff was removed from service on June 10, 2004, with CSX claiming the removal was the result of Plaintiff's failure to pass the GIT on his second attempt and Plaintiff claiming that the given reason was pretextual. (Id. ¶ 16 and Pf. Resp.). While Plaintiff admits he may not, in fact, have scored an 85, he also claims that he was led to believe he may have passed the test and that Rod Gray, a conductor foreman, told him he would have scored an 85, except that two black trainees (who took the test the same day as Plaintiff) had failed and there was concern that a discrimination lawsuit would be filed if Plaintiff was said to have passed the examination. (Montgomery Depo. at 77-85, 140; Def. SOF ¶¶ 36-37 & Pf. Resp.).

Besides the allegation about a potential lawsuit, Plaintiff sets forth other allegations about the GIT. Plaintiff complains that he had to take the test on May 24, 2004, instead of on the following day; that the computer program that scored the test was not up to date prior to the second time he took the GIT; and that the test was not given in a properly controlled environment.

With regard to Plaintiff taking the test on May 24 instead of May 25, the record shows that not enough computers were available for every trainee to take the test simultaneously. Accordingly, the six trainees with the most seniority (including Plaintiff), took the test on May 24, and the remaining trainees took the test on the following day. (Def. SOF ¶¶ 20-22). Despite the fact that he began studying for the GIT on the day he started the CSX training program, Plaintiff contends that he was wronged by having

3

to take the test on May 24, the day he was scheduled to take the test, rather than being allowed to wait one extra day. (Def. SOF ¶¶ 23-24).

With regard to the improper scoring of the test, CSX had already determined that the scoring was not up-to-date in relation to the power brake law. This was the only section of the GIT that was not up-to-date and Plaintiff was given credit for his correct answer to one of the power brake questions. (Def. SOF ¶¶ 25-26).

As for the environment under which the GIT was administered, Plaintiff claims that he and his fellow trainees took the test without supervision. He also complains that the trainees had access to a telephone during the test and, while he had the same access, he claims he did not know how to dial out on the phone. (Def. SOF ¶¶ 28-32 & Pf. Resp.).

While each employee signed an oath that he or she would not cheat on the GIT, Plaintiff claims the trainees had the opportunity to cheat. However, there is no evidence any of the trainees cheated on the test, nor does Plaintiff claim to know whether any of the trainees did, in fact, cheat on the test. (Def. SOF ¶¶ 33-36 & Pf. Resp.).

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the

4

initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

As indicated at the outset, this is the second dispositive motion to be considered by the Court in this case. Defendant could not prevail on its Motion to Dismiss because the standard was

5

whether Plaintiff could prove any set of facts consistent with his allegations which would entitle him to relief. Now, however, the standards have changed yet Plaintiff has presented little to support his claims, and instead relies upon mere allegations and speculation. That, however, is insufficient for purposes of summary judgment.

## A. **Plaintiff's Tennessee Public Protection Act Claim**

In this Court's earlier Memorandum regarding Defendant's Motion to Dismiss, the Court reviewed Tennessee's law relating to whistleblower retaliation. As noted in that Memorandum, "the Tennessee Public Protection Act, also known as the Tennessee 'Whistleblower' Act, was enacted to protect employees from being discharged in retaliation for 'blowing the whistle' on infractions of rules, regulations, or the law pertaining to the health, safety, and general welfare of the public." Guy v. Mutual of Omaha Ins. Co., 79 S.W.2d 528, 535 (Tenn. 2002). In relevant part, the Act provides: "(a) No employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities." Tenn. Code Ann. § 50-1-304. "Illegal activities" are defined to mean "activities which are in violation of the criminal or civil code of this state or the United States or any regulation intended to protect the public health, safety or welfare." Id.

In order to establish a claim under the TPPA for retaliatory discharge, a plaintiff must show that: (1) he was an employee; (2) he refused to remain silent about violations of law; (3) he was

6

fired; and (4) an exclusive causal relationship exists between his refusal to remain silent and his firing. <u>Henderson v. Corrections Corp. of Am.</u>, 918 F.Supp. 204, 209 (E.D. Tenn. 1996); <u>Griggs v. Coca-Cola Employees' Credit Union</u>, 909 F.Supp. 1059, 1063 (E.D. Tenn. 1995).

In his response brief, Plaintiff claims that "the record speaks eloquently to the unavoidable conclusion that Mr. Montgomery has easily met or exceeded the proof requirements for all four prongs of the *prima facie* test." (Docket Entry No. 27 at 4). In support of that contention, Plaintiff writes:

> Mr. Montgomery has sworn that there were discrepancies in the test . . . His grade was inaccurate and an accurately graded test would have passed him. He has testified that the fashion in which CSX administered the test was racially discriminatory, and that its grading policies were, in effect, even more so. Racial discrimination in the workplace is unlawful . . . that is of course what those statutes that have collectively come to be known as Title VII are all about.

<u>Id</u>. The record is not as eloquently spoken on the whistleblower claim as Plaintiff contends.

Plaintiff raises several complaints about the administration of the test, yet he wholly fails to establish that any of the perceived shortcomings about which he complains made the test or its administration unlawful. For instance, Plaintiff complains he had to take the GIT on May 24 instead of May 25. However, the undisputed evidence is that there were only six computers available for those taking the test on the day it was originally scheduled and the six trainees with the most seniority (including Plaintiff) took the test the first day with the remaining trainees taking the

7

test the following day. Plaintiff wholly fails to show how this was any sort of "illegal activity," even if, as he suggests, he had one day less to study than some of the other trainees.

Similarly, Plaintiff fails to show any illegality in the scoring of the tests. It is undisputed that the GIT originally was not scored correctly because the scoring program was not up-to-date regarding a recent change in the regulations surrounding power brakes. However, it is also undisputed that the tests were re-scored for all trainees to take into account the change in the regulations and, in fact, Plaintiff's score was raised from 83 to 84.

Plaintiff also fails to show what alleged illegality occurred because the test was not proctored and there was a phone in the room where the test was being taken. He claims under such a set-up cheating could occur and there were rumors that some of the trainees used phones to seek outside assistance on the open book test. However, Plaintiff admits that he does not know whether, in fact, any of the three trainees in the room cheated - only that they had the opportunity to do so, the same opportunity Plaintiff had since he too took the test in a room with a phone.

Finally, Plaintiff claims that he was told by a conductor foreman that he was failed because two African American trainees who failed the test threatened to sue CSX. Presumably, Plaintiff's contention is that this was discriminatory, i.e. that a Caucasian employee was selected to fail because two African Americans had failed which would suggest no discrimination against the African

8

American employees. Even if this statement was made, the problem that Plaintiff has is that he has presented absolutely no evidence that he did, in fact, score above an 85 on the GIT. To the contrary, the evidence shows otherwise and Plaintiff admitted in his deposition he had no evidence suggesting he passed the GIT:

> Q. Okay, What evidence do you have that you made an 85 and it was reversed.
> A. None. Without the testimony of Gail Zimmerman,[2] we don't.
> Q. So you have no evidence?
> A. No.

(Montgomery Depo. at 85).

Plaintiff simply has provided no evidence to the Court to suggest that Defendant engaged in an unlawful activity so as to support the first element of a cause of action under the whistleblower statute. Even if he had, his claim fails because he has not presented evidence to establish the fourth element - an exclusive causal relationship between his refusal to remain silent about an illegal act and his firing.

Quite the contrary, the record, as already indicated, shows that Plaintiff did not in fact pass the GIT. Under the Agreement with the union, Plaintiff and his fellow trainees were required to score 85 or better in order to remain employed with CSX. The first time, Plaintiff scored 77 and the second time 83 (which was

---

[2]Gail Zimmerman works in corporate headquarters and (although not clear from the record presented) appears to have something to do with the grading or reviewing of test scores. Despite the fact that discovery has closed, Plaintiff did not take Zimmerman's deposition nor provide an affidavit from her which would support his assertion that he could have received more than an 85 on the second GIT.

9

adjusted to 84 to account for a correct answer on a power brake question). Because Plaintiff did not score an 85 he was removed from service precisely as required. In his deposition, Plaintiff conceded that scoring less than 85 on the GIT was cause for termination:

> Q: Under the labor agreement that you agreed to be bound by, you had to be terminated immediately didn't you?
> A. Yes, sir. It never really stated that you had to be terminated but that you were taken out of service.
> Q. Okay. So under the letter agreement, if you obtained less than 85 on the two occasions, you were taken out of service?
> A. Yes, sir.
> Q. You, in fact, obtained less than 85 on the two occasions and were taken out of service?
> A. Yes, sir.

(Id. at 56-57). As for being terminated for engaging in, or acquiescing in illegal activity, the following testimony from Plaintiff's deposition suggests even he does not believe he was terminated for engaging in such activity:

> Q. Okay. Throughout the time that you were employed at CSX-
> A. Yes, sir.
> Q. – did they ever ask you to be quiet or participate in any illegal behavior?
> A. I would think that the, helping the other cubs[3] on the Operating Rules Test would have been illegal behavior.
> Q. Okay. Anything else?
> A. Now this is at CSX?
> Q. Yes.
> A. No, sir. Don't believe so.
> Q. Okay. Now, what did helping the other cubs have to do with you being fired?

---

[3] "Cubs" is the nickname given to trainees. Plaintiff asserts he and other trainees were told to help other "cubs" while they were taking the Operating Rules Test. Plaintiff does not base his complaint on this test since he passed it prior to taking the GIT.

10

> A. I can't say that being instructed to help the other
> cubs had anything to do with me getting fired.

(Id. at 92-93).

In any event, Plaintiff has wholly failed to show any illegality engaged in by CSX in regard to his employment or link any activity about which he complained with his termination. As such, summary judgment is appropriate on Plaintiff's whistleblower claim.

**B. Plaintiff's Breach of Contract Claim**

CSX seeks summary judgment on Plaintiff's claim for breach of contract because he cannot establish the elements of such a claim, and, even if he could, the claim would be preempted by federal law because it is a "minor dispute" under the Railway Labor Act, 45 U.S.C. § 151a ("RLA"). Similar arguments were addressed, but rejected, in this Court's ruling on the Motion to Dismiss because, at the time, this Court did not "know if a Collective Bargaining Agreement exists, what its terms may be, and whether it even applies to probationary employees." (Docket Entry No. 17 at 7). Those questions have now been answered and Defendant is entitled to judgment on Plaintiff's breach of contract claim.

Section 2 of the RLA preempts state laws governing "minor disputes" between employers and employees. Hawaiian Airliners, Inc. v. Norris, 512 U.S. 246, 156, 114 S.Ct. 2239 (1994). The Sixth Circuit has noted a breach of contract claim is an issue of "minor dispute" under the RLA since "minor disputes include claims involving the meaning or application of an existing collective

11

bargaining agreement provision to a specific situation or case." Wolfe v. Norfolk Southern Railway Co., 66 Fed. Appx. 532, 535 (6th Cir. 2003). Thus, "if the resolution of [a] state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is preempted." Capraro v. United Parcel Service, 993 F.3d 328, 331 (3d Cir. 1993).

Recognizing the distinction between "minor" and "major" disputes, Plaintiff nonetheless asserts his contract claim is properly before the Court because the Court is not "dealing with the simple fact of termination without components of workplace discrimination and retaliation[.]" (Docket Entry No. 27 at 6). Leaving aside that Plaintiff has utterly failed to show workplace discrimination or retaliation, this case is, in fact, about an alleged breach of the Agreement. The very essence of Plaintiff's breach of contract claim hinges upon interpretation of the Agreement because without the Agreement, he would be an at-will employee with no contractual protection.

Effectively, Plaintiff has tried to meld his two causes of action into one. However, Defendant's preemption argument is directed only to the breach of contract claim and that claim rests upon an interpretation of the Agreement with the ultimate question being whether Plaintiff was wrongfully removed from service because he did not meet the requirements for employment. The answer to that question requires looking to the Agreement which sets forth the requirements for continued employment, including that trainees pass a final examination. As such, Plaintiff's contract claim is

12

preempted by the RLA. See, Consolidated Rail Corp. v. Railway Labor Exec. Assoc., 491 U.S. 299, 304 (1989)(it is for the court to characterize the dispute and if the disputed action arguably can be justified by the existing agreement, the controversy is a minor dispute and within the exclusive province of the RLA).

Regardless of whether the breach of contract claim is preempted, it is clear Plaintiff cannot recover on the claim in any event. Plaintiff's only argument regarding the substance of his breach of contract claim is as follows:

> As to the allegations [of] breach of contract, CSX is correct in its assertion that the contract provided for terminating an apprentice conductor if he twice failed to score 85. Where the railroad's reasoning is found wanting is that it studiously ignores Montgomery's assertions – to which as noted above he has sworn – that his failure was a result of unlawful workplace discrimination, or retaliation for "whistleblowing," or both. Either of those are breaches. On this issue, nothing more need be said.

(Docket Entry No. 27 at 8).

Something more needs to be said in order to survive a properly supported motion for summary judgment. Plaintiff's bare assertion that he was retaliated against for whistleblowing or subject to discrimination is not sufficient. Moreover, discrimination and whistleblowing are otherwise protected by law and are not a part of the Agreement. Instead the Agreement sets forth the training program and what is required by a trainee to become a full-time employee.

Simply put, Plaintiff cannot establish the elements for a breach of contract claim. "The essential elements of any breach of

13

contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract." ARC LifeMed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 25 (Tenn. Ct. App. 2005). In this case, Plaintiff was required to score 85 or better on the GIT. He did not do so and under the Agreement was subject to being removed from service. That is exactly what occurred and Plaintiff therefore has no claim for breach of contract.[4]

### IV. CONCLUSION

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 23) will be granted.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

---

[4] In his Complaint, Plaintiff also suggested in passing that Defendant's scoring of the test was negligent. However, a negligence claim has not been argued in the papers presently before the Court. To the extent Plaintiff may be seeking to assert a claim for negligence, Defendant is entitled to summary judgment because Plaintiff has not shown any breach of a duty owed by CSX to him.

14